**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DUSTIN PARKER,

                                    Petitioner,                    5:24-cv-886 (BKS/TWD)

v.

CLINT HALFTOWN, TIMOTHY TWOGUNS,
DONALD JIMERSON, GARY WHEELER, MICHAEL
BARRINGER, and JONATHAN DEKANSKI, in their
official capacities as members of the Cayuga Nation
Council, and JOSEPH E. FAHEY, in his official capacity
as Cayuga Nation Tribal Court Judge,

                                    Respondents.

**Appearances:**

*For Petitioner:*
Daniel J. Hurteau
Nixon Peabody LLP
677 Broadway, 10th Floor
Albany, NY 12207

*For Respondents:*
David G. Burch, Jr.
Michael E. Nicholson
Barclay Damon
125 East Jefferson Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On July 17, 2024, Petitioner Dustin Parker filed a petition for a writ of habeas corpus

under the Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. §§ 1301–03. (Dkt. No. 1).

Petitioner names as respondents: Clint Halftown, Timothy Twoguns, Donald Jimerson, Gary

Wheeler, Michael Barringer, and Johnathan Dekanski, in their official capacities as members of the Cayuga Nation Council (the "Council Respondents"), as well as Joseph E. Fahey in his official capacity as the Cayuga Nation Tribal Court Judge. (*Id.*). The first, second, and third causes of action allege that Respondents banished Petitioner from the Cayuga Nation reservation, seized Petitioner's "Pipekeepers" smoke shop in Seneca Falls, New York, and issued a Writ of Execution granting Respondents ownership of Petitioner's Pipekeepers smoke shop (and residence) in Montezuma, New York, in violation of the ICRA's prohibition on the denial of liberty or property without due process of law, 25 U.S.C. § 1302(a)(8). (Dkt. No. 1, at 22–29). The fourth cause of action alleges that Respondents seized the Seneca Falls Pipekeepers and its contents in violation of the ICRA's prohibition on "tak[ing] . . . private property for public use without just compensation," 25 U.S.C. § 1302(a)(5). (Dkt. No. 1, at 29–30). The fifth cause of action alleges that Respondents' search and seizure of the Seneca Falls Pipekeepers violated the ICRA's prohibition on unreasonable searches and seizures, 25 U.S.C. § 1302(a)(2). (Dkt. No. 1, at 30–31). The sixth cause of action alleges that the Council Respondents' promulgation of the Banishment Ordinance violated the ICRA's prohibition on the passage of "any bill of attainder or ex post facto law," 25 U.S.C. § 1302(a)(9). (Dkt. No. 1, at 31–32). Petitioner seeks a writ of habeas corpus, permanent injunctive and declaratory relief, and award of costs and fees. (*Id.* at 32–33).

Presently before the Court is Respondents' motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), (Dkt. No. 39), and Petitioner's motion for a preliminary injunction under Rule 65 seeking to enjoin Respondents from, *inter alia*, entering, removing Petitioner, or taking possession of, the Montezuma Pipekeepers property. (Dkt. No. 2; Dkt. No. 12). The motions are

fully briefed. (Dkt. Nos 33, 37, 41, 44). For the reasons that follow, Respondents' motion to dismiss is granted in part and denied in part and Petitioner's motion for a preliminary injunction is denied.

## II.    FACTS[1]

### A.    The "Halftown Faction" and the "Traditionalists"

This Petition stems from an ongoing dispute that has been litigated in tribal, state, and federal forums[2] concerning Petitioner's opening of, and Respondents' efforts to shut down, the "Pipekeepers" stores[3] in Seneca Falls and Montezuma, New York. (Dkt. No. 1, ¶¶ 44, 46). But, more broadly, it arises against the background of a decades-long leadership conflict within the Cayuga Nation, which courts have described a dispute between factions. *See, e.g., Cayuga Nation v. Campbell*, 34 N.Y.3d 282, 284–85 (N.Y. 2019) (introducing action as brought by "[o]ne faction . . . purportedly on behalf of the Nation, against individuals comprising the rival faction" and noting that "[m]embers of the Cayuga Nation . . . have been embroiled in a

---

[1] The facts are taken from the petition and the affidavits and exhibits the parties submitted in connection with these motions. *See J.S.G. ex rel. J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits . . . given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003). The Court's recitation of facts is limited to those relevant to the disposition of Petitioner's motion for a preliminary injunction. However, in considering Respondents' motion to dismiss, the Court has confined its review to the Petition, (Dkt. No. 1), and its exhibits, (Dkt. Nos. 1-1 to 1-20).

[2] This is not the only case in the Northern District concerning the dispute between Petitioner and the Cayuga Nation. *See* Complaint, *Cayuga Nation v. Parker ("Cayuga Nation II")*, 5:22-cv-128 (BKS/ATB) (N.D.N.Y. Feb. 10, 2022), Dkt. No. 1; Notice of Removal, *Parker v. Cayuga Nation ("Cayuga Nation III")*, No. 5:24-cv-856 (BKS/TWD) (N.D.N.Y. July 8, 2024), Dkt. No. 1. On August 12, 2024, the plaintiffs in *Cayuga Nation III* voluntarily dismissed the case without prejudice. *Cayuga Nation III*, 5:24-cv-856, Dkt. No. 9. As of September 24, 2024, *Cayuga Nation II* remained pending. *Cayuga Nation II*, 5:22-cv-128, Dkt. No. 130. There has also been at least one case filed in the Western District of New York. *See* Complaint, *Cayuga Nation v. Diebold "Cayuga Nation I")*, No. 6:21-cv-6630 (W.D.N.Y. Oct. 7, 2021), Dkt. No. 1 (naming, among others, Parker as a defendant), *voluntarily dismissed as to Parker by Cayuga Nation*, (W.D.N.Y. Apr. 4, 2022), Dkt. No. 46.

[3] Respondents describe Pipekeepers as "an unlicensed business located on the Cayuga Nation Reservation that sells untaxed cigarettes and illegal merchandise." (Dkt. No. 33-2, ¶ 4).

leadership dispute for more than a decade"); *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 352, 355 (D.D.C. 2018) (reviewing administrative decisions by the Bureau of Indian Affairs and the Department of the Interior recognizing "one faction within the Cayuga Nation," but observing that this "faction" referred "to itself as the 'Cayuga Nation Council'" but was "alternatively" referred to as the "Halftown Group"); *George et al. v. Eastern Reg'l Dir., Bureau of Indian Affairs*, 49 IBIA 164, 165, 2009 WL 1664693, at *2, 2009 I.D. LEXIS 41, at *1–4 (May 4, 2009); (*see also* Dkt. No. 1, ¶ 16 (asserting that the "Cayuga nation has been embroiled in [a] . . . leadership dispute" for "two decades")). Indeed, throughout his submissions, Petitioner refers to the Cayuga Nation Council (herein referred to as "Council Respondents"), of which Respondent Clint Halftown is a member, as the "Halftown Faction." (*See generally* Dkt. No. 1).

According to Petitioner, in 2004, Halftown, who then held "a temporary position on the Cayuga Nation Council, refused to surrender his position when directed to do so." (*Id.* ¶ 16). In 2016, the Bureau of Indian Affairs ("BIA"), designated Halftown "as the Nation's Federal Representative." (*Id.* ¶ 17 (citing Letter from Bruce Maytubby, E. Reg'l Dir., U.S. Bureau of Indian Affs., to Clint Halftown, Cayuga Nation Council, and William Jacobs, Cayuga Nation Council (Dec. 15, 2016))). Petitioner asserts that "[t]his acknowledgment occurred despite multiple statements from the then-federally recognized leadership of the Cayuga Nation, the Council of Chiefs and Clan Mothers, informing the BIA of Respondent Halftown's proper removal." (*Id.* ¶ 18). Halftown's designation "was subsequently affirmed by" the Acting Assistant Secretary for Indian Affairs. (*Id.* ¶ 19). Petitioner asserts that Halftown's "Federal Representative position is a fictional role created by the BIA, with no corollary either under the Nation's law, the Great Law of Peace that governs the Nation and other traditional Haudenosaunee governments, or any other federal law or regulation." (*Id.* ¶ 20).

According to the Petition, in 2019, the Assistant Secretary for Indian Affairs, "issued a policy letter that inappropriately expanded upon the authority granted to Respondent Halftown as the Federal Representative, essentially granting the Halftown Faction Respondents full, unfettered control over the Cayuga Nation and its citizens." (Dkt. No. 1, ¶ 25). Petitioner asserts that after this "expansion of authority, the Halftown Faction Respondents immediately propagated its own police force, court system, and laws," which Respondents "designed to eliminate the enrolled Cayuga citizens who support the rightful leadership of the Nation" and do not recognize "the authority of the Halftown Faction." (*Id.* ¶ 26). Petitioner identifies these citizens, including himself, as "Traditionalists." (*Id.* ¶¶ 26–27).[4]

### B.    Opening of Seneca Falls Pipekeepers

In August 2021, Petitioner began operating a Pipekeepers "gas station and convenience store" in Seneca Falls, New York. (Dkt. No. 1, ¶ 44). Petitioner had subleased the Seneca Falls premises "and registered his business in accordance with the regulations of the town of Seneca, New York." (*Id.* ¶ 45). However, the Council Respondents assert that the Seneca Falls Pipekeepers is "an unlicensed business located on the Cayuga Nation Reservation" that, in

---

[4] Petitioner asserts that the Council Respondents have "publicly characterized" the Traditionalists "as 'very unpredictable,' 'explosive,' and 'extreme'" and "referred to Traditionalists as violent criminals and thieves who steal from the Nation and present an overarching threat to the public safety of local communities." (Dkt. No. 1, ¶¶ 28–29 (citing Jimmy Jordan, *Years Long Dispute in Cayuga Nation Sees Tribal Arrests, Trials Beginning*, Ithaca Voice, Sep. 13, 2022, https://ithacavoice.org/2022/09/years-long-dispute-in-cayuga-nation-sees-tribal-arrests-trials-beginning/ [https://perma.cc/LZE5-ECVA]; Maria Stagliano, *Cayuga Nation Official Statement for Seneca County Board of Supervisors Meeting* (May 10, 2022), at 4–5)). Petitioner alleges that the Council Respondents hired "at least 30" individuals from an outside security company to staff the Cayuga Nation Police Department ("CNPD"). (*Id.* ¶ 30 (describing the CNPD as consisting "largely or totally . . . of mercenaries for hire")). Petitioner asserts that the "CNPD has a hostile relationship with Traditionalists," (*id.* ¶ 31 (citing *inter alia* Megan Zerez, *More Violence, Surprise Demolitions on Cayuga Tribal Lands as Leadership Dispute Continues*, WXXI News NPR, Aug. 8, 2022, https://www.wxxinews.org/local-news/2022-08-08/violence-demolitions-cayuga-tribal-lands-leadership-dispute [https://perma.cc/9MVP-AA2Z])), and has "repeatedly attacked Traditionalists with bear spray, pepper spray, nightsticks, [and] hammers" for "benign" activities, such as "attempting to meet with the press or peacefully protest" CNPD activity, (*id.* ¶ 32 (citing Jesse McKinley, *Bulldozing. Kidnapping Claims. Inside a Battle Over a Tribe's Future.*, N.Y. Times, Mar. 13, 2023, https://www.nytimes.com/2023/03/13/nyregion/cayuga-nation-tribe-new-york.html)).

addition to selling "untaxed cigarettes and illegal merchandise," Petitioner had "installed signs indicating that Pipekeepers was a 'Cayuga Nation' store" and "diverted business from Nation-owned and operated stores." (Dkt. No. 33-2, ¶¶ 4–6).

### C.    Respondents' Attempts to Shut Down Seneca Falls Pipekeepers

#### 1.    Civil Action in Western District of New York

On October 7, 2021, the Nation filed suit in the Western District of New York against Parker and several Seneca-Cayuga Nation officials, asserting it had the "exclusive right to sell, and to authorize the sale of, Cayuga-brand and other native brand cigarettes on its reservation" and sought a temporary restraining order and preliminary injunction to restrain Defendants from "selling, or authorizing or permitting the sale of, tax-free cigarettes and other tax-free goods on the Cayuga Nation's reservation." *Cayuga Nation I*, No. 6:21-cv-6630 (W.D.N.Y. Oct. 7, 2021), Dkt. No. 1; *see also id.* at Dkt. No. 12-7, at 2. The Western District denied the Nation's motion for injunctive relief, *Cayuga Nation I*, No. 6:21-cv-6630 (W.D.N.Y. Nov. 24, 2021), Dkt. No. 13, and the action was ultimately dismissed, *id.*, Dkt. No. 48 (closing case on April 8, 2022).

#### 2.    Notices of Violation of Business Ordinance

On October 21, 2021, the Nation notified Petitioner that his operation of the Seneca Falls Pipekeepers violated the Cayuga Nation Amended and Restated Business License and Regulation Ordinance (the "Business Ordinance"). (Dkt. No. 33-5, at 2). The notice alleged two violations: operation of a business on "Nation land—which is defined to include all land within the boundaries of the still-existing, federally-recognized Cayuga Nation Reservation—without a business license issued by the Nation," and engagement in business on Nation land "that directly or indirectly competes with any business conducted by the Nation." (*Id.*). The notice gave Petitioner ten days to comply "before additional remedies would be sought." (*Id.*). According to Petitioner, because the Business Ordinance "completely bars any citizen from operating a gas

station or convenience store, 'compliance' . . . meant" immediate and permanent cessation of Pipekeepers' operations. (Dkt. No. 1, ¶ 46).

The Nation issued a second notice on October 22, 2021, again identifying the alleged Business Ordinance violations and warning that failure to comply could result in "(1) a civil fine not to exceed $1,000 per day; (2) closure of the premises; and (3) eviction and removal of any person operating the business on the premises, as well as seizure of any property being used directly or indirectly to operate the business." (Dkt. No. 33-5, at 2–3).[5]

### 3.    Civil Action in Nation Court

#### a.    Complaint and Injunctive Relief

On November 1, 2021, the Nation filed a complaint against Petitioner in Cayuga Nation Civil Court ("Nation Court"), *Cayuga Nation v. Dustin Parker and Dustin Parker d/b/a Pipekeepers Tobacco & Gas*, Index No. CV-21-016 (the "Nation Court Action"), and moved for an order to show cause seeking monetary and injunctive relief enjoining the operation of the Seneca Falls Pipekeepers. (Dkt. No. 33-5, at 3). Cayuga Nation Civil Court Judge, Respondent Joseph E. Fahey,[6] signed the order to show cause on November 2, 2021, directed service on Petitioner by November 10, 2022, scheduled a hearing for December 2, 2021, and "temporarily enjoined and restrained" Petitioner "from the continued operation of [the Seneca Falls] Pipekeepers Tobacco & Gas." (*Id.*). According to Respondents, Petitioner was personally served

---

[5] Petitioner subsequently (on June 9 and July 13, 2022), applied for a license for Pipekeepers "pursuant to the Business Ordinance (which required the payment of $1,000 for the privilege of applying)." (Dkt. No. 1, ¶ 68). In a letter dated July 25, 2022, the Cayuga Nation Director of Commerce notified Petitioner that his application "has been disapproved" on "[t]he basis" that Petitioner had "continued to operate [the] business in violation of the Ordinance as well as" in violation of an order by the Cayuga Nation Civil Court, (Dkt. No. 1-4, at 2), described supra Section II.F.2.

[6] Unless otherwise indicated, all Nation Court proceedings were presided over by the Hon. Joseph E. Fahey, Cayuga Nation Civil Court Judge.

with the signed order to show cause, but continued to operate the Seneca Falls Pipekeepers and did not appear for the December 2, 2021 hearing or otherwise respond. (*Id.* at 3–4).

On December 2, 2021, the Nation Court entered an order pursuant to the Business Ordinance assessing a civil fine of $1,000 per day for violation of the ordinance beginning October 21, 2021, and permanently enjoining the operation of the Seneca Falls Pipekeepers. (Dkt. No. 33-4, at 1–2). On December 6, 2021, a Cayuga Nation Clerk entered judgment against Petitioner in the amount of $45,000. (Dkt. No. 33-2, ¶ 7).

### b.    Contempt and Eviction Order

On December 21, 2021, the Nation applied for an order to show cause "seeking to have [Petitioner] held in contempt" for continuing to operate the Seneca Falls Pipekeepers, in violation of: the Nation Court's November 2 order temporarily enjoining the operation of the Seneca Falls Pipekeepers; the Nation Court's December 2 order permanently enjoining the operation of the Seneca Falls Pipekeepers and assessing a civil fine of $1,000 per day for violation of the Business Ordinance beginning October 21, 2021; and the Nation Court's December 6 judgment in the amount of $45,0000. (Dkt. No. 33-5, at 1, 5). The Nation Court issued the order to show cause on December 22, directed Petitioner to respond by December 23, and scheduled a hearing for December 24. (*Id.;* Dkt. No. 1, ¶ 53). Petitioner asserts he was "unable to respond" or "secure counsel on such short notice." (Dkt. No. 1, ¶ 54).

On December 28, 2021, the Nation Court issued an order finding that Petitioner "continued to operate Pipekeepers in violation of" the Nation Court's orders and the Business Ordinance and that his "disobedience of this Court's Orders constitutes continuing civil contempt." (Dkt. No. 33-5, at 5). The order permitted the Nation to "enter upon and close the Pipekeepers facility as soon as can be done in a manner deemed appropriate by Nation law enforcement," "evict and remove any person operating the Pipekeepers facility" and "seize any

and all property" and goods used in the operations of Pipekeepers. (Dkt. No. 1, ¶ 54; Dkt. No. 33-5, at 7–8).

### D.    Eviction of Petitioner from Seneca Falls Pipekeepers

On December 29, 2021, the Council Respondents purchased the property on which the Seneca Falls Pipekeepers was located from the Seneca-Cayuga Nation. (Dkt. No. 1, ¶ 54).

On January 1, 2022, at approximately 2:00 a.m., Petitioner received a security notification "that armed individuals were entering Pipekeepers." (*Id.* ¶ 55). Upon arrival, Parker saw the CNPD "seizing the inventory of Pipekeepers." (*Id.*). The CNPD "broke Parker's window[,] roughly detained him and his wife," and "seized approximately $40,000 (at retail value) of inventory and gas from Pipekeepers," along with "its business records, computers, electronic files, and cash." (*Id.*). According to Petitioner, "[l]ater that month," Respondents, opened a new convenience store at the location of the former Pipekeepers" and "began to sell [the Pipekeepers] inventory in its own store" without Petitioner's permission and without compensating him. (*Id.* ¶ 57).

### E.    Opening of Montezuma Pipekeepers

Following the Nation's seizure of the Seneca Falls Pipekeepers, Petitioner purchased a property in Montezuma, New York "with the intent of opening a new Pipekeepers store." (Dkt. No. 1, ¶ 59). According to Petitioner, "the Montezuma Property is not located in, or even near, land owned by Respondents, the Nation, or any of the Nation's people" or "within lands that are held in Trust for the Cayuga Nation." (*Id.* ¶ 113). Respondents assert that the Montezuma property is "located on the Nation's Reservation" and that Petitioner "continues his illegal operations" of the Pipekeepers store in Montezuma. (Dkt. No. 33-2, ¶ 10).

**F.    Respondents' Attempts to Shut Down Montezuma Pipekeepers**

**1.    Civil Action in Northern District of New York**

On February 10, 2022, the Nation filed *Cayuga Nation II*, 5:22-cv-128 in this Court

alleging Petitioner and others (through the Seneca Falls and Montezuma Pipekeepers stores)

were operating a criminal enterprise in violation of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. *Cayuga Nation II*, 5:22-cv-128, Dkt. No. 1.

The same day, the Nation filed a motion for a preliminary injunction seeking an order enjoining

Petitioner, and others, "from opening or operating any business" on the Montezuma property. *Id.*,

Dkt. No. 2. This Court stayed the action pending exhaustion of proceedings in Nation Court. *Id.*,

Dkt. No. 49. On August 12, 2022, following the parties' exhaustion of tribal court remedies, the

Court denied the Nation's motion for a preliminary injunction and granted in part and denied in

part the defendants' motion to dismiss. *Id.*, Dkt. No. 59. This action remains in discovery.

**2.    Nation Court Action**

**a.    Amended Complaint and Injunctive Relief**

The same day it filed the complaint and motion for a preliminary injunction in *Cayuga

Nation II*, February 10, 2022, the Nation filed an amended complaint request in the Nation Court

Action and sought an order enjoining Petitioner from the continued operation of the Montezuma

Pipekeepers. (Dkt. No. 1, ¶ 60; *see also* Dkt. No. 33-7, at 1). On March 11, 2022, the Nation

Court issued an order permanently enjoining "the operation of [the Montezuma] Pipekeepers,"

and assessing "a civil fine of $1,000 per day for [Petitioner's] violation of the Ordinance

beginning February 17, 2022, the date service of the 'Notice of Violations' was made . . . and

continuing until such time as Pipekeepers ceases operations." (Dkt. No. 33-6, at 1–2). On March

21, 2022, the Nation Court issued a default judgment in the amount of $39,050. (Dkt. No. 1,

¶ 61; Dkt. No. 33-7, at 1).

On May 17, 2022, Petitioner attempted to "seek relief" from the March 21, 2022 default judgment, "which was denied." (Dkt. No. 1, ¶ 64; *see also* Dkt. No. 33-7 (Decision and Order entered on June 28, 2022 by Nation Court denying Petitioner's application to vacate the March 21, 2022 default judgment)).

### b.    Contempt Orders

On June 29, 2022, the Nation filed a motion in the Nation Court Action seeking to hold Petitioner in contempt for failure to cease operations of the Montezuma Pipekeepers, in violation of the March 11, 2022 Nation Court order. (Dkt. No. 1, ¶ 65; Dkt. No. 33-8, at 1). On July 15, 2022, the Nation Court granted the Nation's motion, declared Petitioner to be "in contempt of this Court," assessed a civil fine in the amount of $126,000, representing $1,000 per day in accordance with the Business Ordinance, and ordered that the fine continue to accrue "at the rate of $1,000 per day until Pipekeepers ceases operations." (Dkt. No. 33-8, at 2).

The Nation returned to the Nation Court on March 1, 2023 to seek a third order of contempt against Petitioner for his operation of the Montezuma Pipekeepers. (Dkt. No. 1, ¶ 66; Dkt. No. 33-10). On April 24, 2023, the Nation Court issued an order granting the Nation's motion, declaring Petitioner to be in "continuing contempt of this Court and its July 15, 2022 Order," and assessing a civil fine in the amount of $283,000.[7] (Dkt. No. 1, ¶ 66; Dkt. No. 33-10, at 2). The Nation Court entered judgment on April 25, 2023. (Dkt. No. 12-2, at 3). There is no evidence indicating that Petitioner paid this, or any other fine, imposed by the Nation Court.

---

[7] This sum appears to represent $1,000 per day for the 283 days between the July 15, 2022 contempt order and April 24, 2023, the date the Nation Court granted the third order of contempt.

### 3.    Banishment Proceedings

#### a.    Petitioner's "Total Banishment"

On October 17, 2022, the Council Respondents enacted the "Cayuga Nation Banishment Ordinance." (Dkt. No. 1-5, at 2–6). On February 28, 2023, Petitioner received a "Notice of Potential Banishment" stating that "the Cayuga Nation Council, by resolution dated February 16, 2023, after a referral from the Heron Clan, determined to issue this Notice of Potential Banishment pursuant to the Nation's Banishment Ordinance." (Dkt. No. 1-6, at 2). The Notice informed Petitioner "that the bases for . . . potential banishment are the following allegations, each of which, if established, constitutes independent grounds for banishment under Section 2.3 of the Banishment Ordinance":

> 1. Operating a smoke shop and marijuana dispensary in Montezuma, New York on the Nation's Reservation and without first obtaining a license under the Nation's Business License Ordinance.
>
> 2. Previously operating a smoke shop, marijuana dispensary, and gas station in Seneca Falls, New York on the Nation's Reservation and without first obtaining a license under the Nation's Business License Ordinance.
>
> 3. Failing to respond to criminal charges in the Nation's Court and ignoring the warrant for your arrest.
>
> 4. Occupying a Nation owned house at 25 Spruce Lane without paying rent on it and continuing to ignore judgments against you for the unpaid rent.

(*Id.*). The Notice informed Petitioner of his "opportunity to be heard by the Council before it [made] a final determination on banishment," that he could be "represented by an attorney at the hearing," and that he would be "afforded the opportunity to present evidence" on his own behalf. (*Id.*). The Notice advised that failure to request a hearing would result in "the Council making a final determination on banishment without further opportunity . . . to be heard" and "that a banishment will result in . . . total exclusion from the Nation's Reservation, and violation of the

terms of a banishment shall be a class A misdemeanor as defined by the Cayuga Nation Penal Code." (*Id.* at 3).

The Council Respondents held a hearing by videoconference on April 9, 2023 with respect to the notice of potential banishment. (Dkt. No. 1-7, at 2). Petitioner appeared "by counsel" but did "not attend[] personally." (*Id.*). "[T]he Nation and [Petitioner] submitted documentary evidence" and the parties were "presented the further opportunity to submit supplemental materials for the Council's consideration prior to any final determination." (*Id.*). On July 13, 2023, the Council Respondents issued a "Notice of Total Banishment of Dustin Parker from the Cayuga Nation Reservation." (*Id.*). The Notice informed Petitioner that the Council Respondents "unanimously made factual findings" that Petitioner had engaged in the alleged conduct as well as "in behavior that poses a threat to the safety, welfare, and order of the Nation" and "unanimously determined" that Petitioner "shall be subject to total banishment from the Nation's Reservation as defined in the Banishment Ordinance." (*Id.* at 3). The Notice further informed Petitioner that he "must immediately vacate the Nation's Reservation," that he was "entirely prohibited from entering onto the Nation Reservation at any future time and for any reason," and that any violation would be a Class A Misdemeanor. (*Id.*).

Petitioner asserts that at the time the Council Respondents issued the Banishment Order, he and his family "resided in a Nation-owned home" and that in accordance with the Banishment Order, they vacated their home and moved into the Montezuma property, which he owned. (Dkt. No. 1, ¶ 77).

> b.    **Petition for Writ of Habeas Corpus in Nation Court**

On June 16, 2023, Petitioner filed a petition for a writ of habeas corpus against Respondent Halftown and the Council Respondents in the Nation Court alleging violations of § 1302 of the ICRA. (Dkt. No. 33-13; Dkt. No. 1, at 22 n.6). Petitioner advanced five causes of

action: (1) deprivation of liberty without due process in connection with Respondents' enactment and application of the Banishment Ordinance, in violation of § 1302(a)(8); (2) deprivation of property without due process of law in connection with the seizure of the Seneca Falls Pipekeepers, in violation of § 1302(a)(8); (3) the taking of property for public use without just compensation, in violation of § 1302(a)(5); (4) unreasonable search and seizure of the Seneca Falls Pipekeepers, in violation of § 1302(a)(8); and (5) that the Banishment Ordinance "constitutes a bill of attainder" and an *ex post facto law*, in violation of § 1302(a)(9) (Dkt. No. 33-13, at 10–16; Dkt. No. 1-14, at 6). Petitioner also sought to enjoin the Council Respondents from continuing the banishment proceedings, attempting to close Pipekeepers or using its property, and prohibiting the Council Respondents from engaging in further legal action. (Dkt. No. 1-14, at 2–3).

On September 25, 2023, the Nation Court entered a Decision and Order finding that the issuance of a writ of habeas corpus was "not warranted" and granting the Nation's motion to dismiss Petitioner's habeas corpus petition. (Dkt. No. 1-14, at 17). Petitioner appealed, (Dkt. No. 37-3), and on February 20, 2024, the Cayuga Nation's Court of Appeals affirmed dismissal, (*see* Dkt. No. 37-4 (Memorandum and Order issued by Edward D. Carni, Chief Judge of the Cayuga Nation Court of Appeals)).

### 4.    Request for Writ of Execution in Nation Court Action

On May 1, 2024, the Nation filed a request in the Nation Court Action for a "Writ of Execution to force the turnover of the Montezuma Property to satisfy the Tribal Court's judgment of $283,000 of fines levied against Parker."[8] (Dkt. No. 1, ¶ 79). On May 5, 2024, the

---

[8] This appears to concern the Nation Court's April 24, 2023, order and corresponding judgment. (*See* Dkt. No. 12-2, at 3; Dkt. No. 33-10). There is no indication the Nation sought the Writ of Execution in connection with any other fine or judgment.

Nation Court granted the Writ of Execution. (*Id.* ¶ 80; *see* Dkt. No. 2-4 (Tribal Court Decision and Order granting Writ allowing seizure of Property in "partial satisfaction of a judgment" in the amount of $283,000, resulting from Petitioner's "continuing and ongoing Contempt of Court by ignoring the Court's order enjoining the operation of his business, known as Pipekeepers and fines imposed therewith"); *see also* Dkt. No. 2-5 (Writ of Execution)). On May 9, 2024, Petitioner filed a notice of appeal with the Tribal Court. (*Id.* ¶ 80). Petitioner also filed a motion to stay enforcement of the Writ while the appeal was pending. (*Id.*). On May 30, 2024, the Nation filed a proposed order for the Writ of Execution in the Nation Court. (*Id.*).

In a letter to the Nation Court dated June 3, 2024, Petitioner objected to the proposed Writ on the ground that it "plainly exceeds the bounds of" the Nation Court's May 5, 2024 Decision and Order, which granted a Writ as to "the deed to" the Montezuma property, by, among other things, granting immediate and full right of ownership all business and personal property, monies, [and] goods . . . located at or within the Property." (Dkt. No. 1-11, at 3–4).

On July 2, 2024, the Nation Court held a hearing on Petitioner's motion to stay and directed Petitioner to post a bond for the $283,000 in fines within seventy-two hours. (Dkt. No. 1 ¶ 81). "After giving [Petitioner] seventy-two . . . hours to try and post a bond, which [Petitioner] was unable to do on such little notice," the Nation Court denied the stay.[9] (*Id.*).

On July 5, 2024, the Nation Court issued the Writ of Execution, which ordered Petitioner to "immediately endorse and turn over the deed to the [Montezuma] Property to the Nation" and further ordered that "regardless of whether [Parker] endorses and turns over the deed to the Property, the Nation shall have the immediate legal right of full ownership, possession, and

---

[9] Petitioner asserts that he "had already posted a bond when taking an appeal of the same judgments to the Fourth Department," in state court. (Dkt. No. ¶ 81). The state court actions are discussed *infra* Section II.F.5.

occupation of the Property," including all "business or personal property, monies, goods . . . or fixtures located at or within the Property." (Dkt. No. 1-9, at 3–4). The Writ also ordered Parker and his family to immediately vacate the Property, barred any occupants from returning to the Property, and permitted the Nation to enter the Property immediately. (*Id.*).

### 5.    State Court Actions

In addition to the above-described legal proceedings, the Nation filed three corresponding actions in New York State Supreme Court seeking to domesticate the judgments it obtained in the Nation Court against Petitioner pursuant to Article 53 of the New York Civil Practice Law and Rules.[10] Specifically, the Nation sought to domesticate the March 21, 2022, default judgment against Petitioner in the amount of $39,050 and the July 15, 2022 second contempt order fining Petitioner $126,000. (Dkt. No. 1, ¶¶ 62, 65–66 (referring to Index No. E2022-0209 (filed March 22, 2022), Index No. E20222-0560 (filed August 1, 2022)). The state court entered judgment in the Nation's favor in both actions, domesticating the Nation Court's judgments. (*Id.* ¶¶ 64–65 (noting that the state Supreme Court entered judgment domesticating the $39,050 and $126,000 judgments on October 12, 2022 and January 5, 2023, respectively). Petitioner appealed both decisions to the Supreme Court of New York Appellate Division, Fourth Department. (*Id.*). On May 2, 2023, the Nation filed a third action in state court, seeking to domesticate the April 24, 2023 third contempt order fining Petitioner $283,000. (*Id.* ¶ 66 (referring to Index No. E2023-0318 (filed May 2, 2023)). The state court stayed the third action pending resolution of the prior two appeals. (*Id.* ¶ 67).

---

[10] N.Y. C.P.L.R. § 5307 allows a New York court to domesticate a foreign country judgment, if it is entitled to recognition, such that the foreign country judgment is "1. conclusive between parties to the same extent as the judgment of a sister state entitled to full faith and credit in this state would be conclusive; and 2. enforceable in the same manner and to the same extent as a judgment rendered in this state."

On July 3, 2024, the Fourth Department, Appellate Division reversed the Supreme Court decisions and dismissed the Nation's petitions to domesticate the Nation Court judgments. *Cayuga Nation v. Parker*, 229 A.D.3d 1066, 1068–69 (N.Y. App. Div. 4th Dep't 2024); *Cayuga Nation v. Parker*, 229 A.D.3d 1069 (N.Y. App. Div. 4th Dep't 2024). The Fourth Department explained that because "the foreign country judgments at issue in these appeals is a fine," Article 53 of the New York Civil Practice Law and Rules, pursuant to which the Cayuga Nation had sought domestication of the judgments, was inapplicable. *Cayuga Nation v. Parker*, 229 A.D.3d 1066, 1068–69 (N.Y. App. Div. 4th Dep't 2024); *see also id.* at 1068 ("Article 53 . . . 'does not apply to a foreign country judgment, even if the judgment grants or denies recovery of a sum of money, to the extent the judgment is . . . *a fine or penalty*.'") (emphasis in original) (quoting N.Y. C.P.L.R. § 5302(b)(2)).

On July 5, 2024, the day the Nation Court issued the Writ of Execution, Petitioner filed a temporary restraining order against Respondents in the Nation's third state Supreme Court action to domesticate a judgment, which, as noted above, had been stayed pending appeal. (Dkt. No. 1, ¶¶ 66–67, 91). Petitioner sought "to enjoin [the Nation] from enforcing the Writ." (*Id.* ¶ 91) Respondents, in turn "withdrew" the third state court action. (*Id.*).

On July 17, 2024, Parker filed the instant Petition and proposed order to show cause in this Court. (Dkt. No. 1).[11]

_____

[11] Counsel for Petitioner has submitted a declaration stating that on July 19, 2024, "one day after" Petitioner's counsel emailed notice of the instant Petition and proposed order to show cause to Respondents' counsel, "Respondents filed a proposed order to show cause in the Nation Court seeking to arrest and detain [Petitioner] pursuant to the Nation Court's orders holding Parker in civil contempt." (Dkt. No. 37-1, ¶ 10; *see also* Dkt. No. 10). According to Petitioner's counsel, "either on, or shortly before, the day [Respondents] filed the proposed order to show cause in the Tribal Court," "Section 4.5" of the Nation's Judiciary Law, which did not specify the punishment for civil contempt, "was amended to permit the Tribal Court to subject a person to confinement for civil contempt of court." (Dkt. No. 37-1, ¶¶ 11–13).

On August 5, 2024, the Nation Court issued an order finding that despite its December 2, 2021 and March 11, 2022 orders permanently enjoining Petitioner from operating Pipekeepers, Petition "has defied this order" and "all other contempt sanctions" and has continued to operate Pipekeepers. (Dkt. No. 33-12, at 1). The Nation Court therefore

On October 16, 2024, the Cayuga Nation Court of Appeals vacated the Writ of Execution and remitted the matter to the Nation Court to determine whether the Montezuma property qualified as a homestead under Rule 33d(1) of the Cayuga Nation Rules of Civil Procedure, which exempts an owner-occupied residence from "forced sale under any process of law." (Dkt. No. 42, at 3).

## III.    MOTION TO DISMISS

### A.    Standard of Review

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49, 2021 WL 5040236, at *3, 2021 U.S. Dist. LEXIS 209018, at *8 (N.D.N.Y. Oct. 29, 2021) (citation omitted). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true[ ] and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). The Court may also "refer to evidence outside the pleadings" and "take judicial notice of documents in the public record, including state court filings."[12] *Krajisnik Soccer Club, Inc. v. Krajisnik Football*

---

ordered that unless Petitioner ceased operation of Pipekeepers by August 9, 2024, he would be confined until he complied with the Nation Court's prior orders. (*Id.*). The Nation Court issued "an arrest warrant to take [Petitioner] into custody . . . on . . . August 9, 2024." (*Id.*). Although Petitioner seeks to supplement his motion for a preliminary injunction with these new facts, they are outlined in an attorney declaration and only briefly referenced in his reply submission. Further, there is no briefing addressing whether such order authorizing Petitioner's arrest and confinement would constitute a severe restraint on liberty sufficient to invoke this Court's habeas jurisdiction under § 1303 of the ICRA and what relief Petitioner would be entitled to in connection with a successful habeas claim on such order. Accordingly, the Court concludes Petitioner has failed to sufficiently supplement his motion.

[12] Respondents state that their Rule 12(b)(1) motion is facial, (Dkt. No. 39-3, at 17), but also ask the Court to take judicial notice of the Nation Court filings and decisions, (Dkt. No. 39-3, at 13 n.4).  Accordingly, the Court applies the above-referenced standard of review. *Cf.*, *Nicholas v. Trump*, 433 F. Supp. 3d 581, 586 (S.D.N.Y. 2020) ("[T]o resolve a facial Rule 12(b)(1) motion, a district court must 'determine whether [the complaint and its exhibits]

*Club, Inc.*, No. 20-cv-1140, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5

(N.D.N.Y. May 26, 2021) (citations omitted).

Courts handling habeas corpus proceedings under § 2254, have found that "[m]otions to

dismiss habeas petitions on procedural grounds pursuant to Rule 12(b)(6) are not inconsistent

with the Habeas Rules, given the wide discretion afforded district judges in the disposition of

habeas petitions." *Adams v. Greiner*, 272 F. Supp. 2d 269, 271 (S.D.N.Y. 2003) (citing *Purdy v.

Bennett*, 214 F. Supp. 2d 348, 353 (S.D.N.Y. 2002)). Neither party has cited case law that would

suggest the application of Rule 12(b)(6) legal standards to the present Petition is anything other

than appropriate. The Court therefore applies the familiar legal standard.

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a

[petition] must provide 'enough facts to state a claim to relief that is plausible on its face.'"

*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The [petitioner] must provide factual

allegations sufficient "to raise a right to relief above the speculative level[.]" *Id.* (quoting

*Twombly*, 550 U.S. at 555). A court must accept as true all factual allegations in the petition and

its exhibits and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*,

768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87,

98 (2d Cir. 2007)); *see also Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.

1999). However, "the tenet that a court must accept as true all of the allegations contained in a

[petition] is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

allege[ ] facts that' establish subject matter jurisdiction." (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56
(2d Cir. 2016)); *Carter*, 822 F.3d at 56 (explaining that when Rule 12(b)(1) motion is facial, i.e., based solely on the
allegations of the complaint or the complaint and exhibits attached to it . . . the plaintiff has no evidentiary burden."
(citing *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

B.    **Analysis**

1.    **Property Seizure Claims**
      **(Second, Third, Fourth, and Fifth Causes of Action)**

Respondents move to dismiss Petitioner's claims of deprivation of the Seneca Falls and

Montezuma Pipekeepers properties without due process, unlawful taking of the Seneca Falls

Pipekeepers, and unlawful search and seizure of the Seneca Falls Pipekeepers on the ground that

they concern property-seizure, not detention, and thus the Court lacks jurisdiction to review them

under the ICRA's habeas provision. (Dkt. No. 39-3, at 19–26, 31–32). Petitioner opposes

Respondents' motion. (Dkt. No. 41, at 11 & n.2, 12–15,). Respondents' motion is granted.

"With Title I of the [ICRA,] Congress sought to . . . appl[y] some basic constitutional

norms to tribal governments, in the form of restrictions similar to those contained in the Bill of

Rights and the Fourteenth Amendment." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d

874, 881 (2d Cir. 1996). As relevant here, 25 U.S.C. § 1302 provides:

> No Indian tribe in exercising powers of self-government shall—
>
> . . .
>
> (2) violate the right of the people to be secure in their persons,
> houses, papers, and effects against unreasonable search and
> seizures, nor issue warrants, but upon probable cause, supported by
> oath or affirmation, and particularly describing the place to be
> searched and the person or thing to be seized;
>
> . . .
>
> (5) take any private property for a public use without just
> compensation; [or]
>
> . . .
>
> (8) deny to any person within its jurisdiction the equal protection of
> its laws or deprive any person of liberty or property without due
> process of law.

25 U.S.C. § 1302(a)(2), (5), (8). However, as the Second Circuit has explained, "Title I of the ICRA identifies explicitly *only one* federal court procedure for the enforcement of the substantive guarantees of § 1302: § 1303 makes available to any person '[t]he privilege of the writ of habeas corpus . . ., in a court of the United States, to test the legality of his detention by order of an Indian tribe." *Poodry*, 85 F.3d at 882 (emphasis added) (quoting 25 U.S.C. § 1303). Indeed, it is well settled that "Title I does not establish a federal civil cause of action against a tribe or its officers, and that no such cause of action," including actions for declaratory or injunctive relief, "can be implied." *Id.* at 884 (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978)); *see also Santa Clara Pueblo*, 436 U.S. at 62 (observing that "[t]wo distinct and competing purposes [were] manifest in the provisions of the ICRA: In addition to its objective of strengthening the position of individual tribal members vis-à-vis the tribe, Congress also intended to promote the well-established federal 'policy of furthering Indian self-government.'" (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974))). Thus, "federal interpretation of the substantive provisions of the ICRA" is precluded "except in cases in which the relief sought could properly be cast as a writ of habeas corpus." *Poodry*, 85 F.3d at 884. Accordingly, because "[S]ection 1303 was intended by Congress to have no broader reach than the cognate statutory provisions governing collateral review of state and federal action," "plaintiffs must allege that defendants posed a 'severe actual or potential restraint on [their] liberty.'" *Shenandoah v. U.S. Dep't of Interior ("Shenandoah I")*, 159 F.3d 708, 714 (2d Cir. 1998) (first quoting *Poodry*, 85 F.3d at 901 (Jacobs, J., dissenting); and then quoting *Poodry*, 85 F.3d at 880).

Habeas relief applies to "more than actual physical custody, and includes parole, probation, release on one's own recognizance pending sentencing or trial, and in the case of tribal affairs, permanent banishment." *Shenandoah v. Halbritter ("Shenandoah II")*, 275 F.

Supp. 2d 279, 285 (N.D.N.Y. 2003) (citing *Poodry*, 85 F.3d at 893–94, 897). In *Poodry*, for example, the Second Circuit found the petitioners' permanent banishment from the Tonawanda Reservation constituted a "severe restraint" on liberty and was sufficient to invoke jurisdiction for purposes of habeas review under the ICRA. 85 F.3d 874. In reaching this conclusion, the Circuit observed not only that banishment had "clearly and historically been punitive in nature," but that the documentary evidence showed that the banishment at issue was a criminal, as opposed to a civil, sanction. *Id.* at 889. It explained that "[w]hile ordinarily the inquiry into whether a sanction is 'criminal' or 'civil' is neither simple nor mechanical," it had "no doubt about its resolution" where, as there: documents from "the Council of Chiefs" indicated that the respondents viewed the petitioners' "conduct as criminal"; the petitioners were "claimed to have engaged in 'unlawful activities,'" including efforts to overthrow "the traditional government"; and the petitioners were convicted of treason. 85 F.3d at 889. The Circuit also noted that so long as the banishment orders stood, the petitioners could "be removed from the Tonawanda Reservation at any time." *Id.*; *see also id.* (characterizing the banishment orders, which made "clear" that "at some point [the petitioners] may be compelled to 'go,' and no longer welcome to 'come'" as "a severe restraint to which the members of the Tonawanda Band are not generally subject.").

In *Shenandoah I*, 159 F.3d 708, which, like the instant case, arose out of a leadership dispute, the plaintiffs brough a claim under the ICRA's habeas provision alleging termination from employment, that they "lost their 'voice[]s within the Nation's government bodies, lost health insurance, were denied admittance into the Nation's health center, lost quarterly distributions paid to all Nation members, were banned from various businesses and recreational facilities" and "were stricken from Nation membership rolls." *Id.* at 714. Contrasting these

allegations with the "punishment that the petitioners faced in *Poodry*"—which, it noted was "considerably more severe"—the Second Circuit found the petitioners failed to allege "a 'severe actual or potential restrain on [their] liberty.'" *Id.* (quoting *Poodry*, 85 F.3d at 880); *see also id.* ("In contrast, plaintiffs in the instant case have not alleged that they were banished from the Nation, deprived of tribal membership, convicted of any crime, or that defendants attempted in anyway to remove them from the Oneida territory.").

The Circuit again addressed the ICRA's habeas provision in *Shenandoah v. Halbritter ("Shenandoah III")*, 366 F.3d 89 (2d Cir. 2004). There, the petitioners filed a habeas petition against Oneida Indian Nation of New York officials based on "an illegal housing ordinance permitting the seizure and destruction of their homes without providing just compensation" and alleging that the housing ordinance was a bill of attainder. 366 F.3d at 91. The district court dismissed the habeas petition for lack of subject matter jurisdiction under the ICRA. *Id.* On appeal, the petitioners pressed the case of one individual in particular, Danielle Patterson. *Id.* Patterson "resided in a trailer . . . with her three minor children," "was arrested and then released after she resisted compliance with an inspection of her home," but arrested a year later and incarcerated for her failure to appear on criminal charges stemming from her resistance to the prior inspection. *Id.* Patterson pled guilty, was sentenced to time served, and released. *Id.* Several days later, "Patterson's home was demolished." *Id.* at 91. After reciting these facts, the Second Circuit considered "whether the actions taken against the Petitioners have resulted in the legal equivalent of a banishment, or otherwise qualify as a 'severe actual or potential restraint on [their] liberty,' which might provide habeas jurisdiction." *Id.* at 92. The Circuit found they did not:

> In the instant case, Respondents' enforcement of their housing ordinance did not constitute a sufficient severe restraint on liberty to invoke the Court's habeas corpus jurisdiction.
>
> The gravamen of Petitioners' Complaint focuses on the destruction of their homes, which can be described more aptly as an economic restraint, rather than a restraint on liberty. As a general rule, federal habeas jurisdiction does not operate to remedy economic restraints.

*Id.*

Here, Petitioner's due process, unlawful takings, and unlawful search and seizure claims are premised on: Respondents' eviction of Petitioner from the Seneca Falls Pipekeepers; Respondents' seizure and "all cash, inventory, gasoline, records, computers, and electronic files" from the Seneca Falls Pipekeepers; and, Respondents' efforts to stop Petitioner's operation of the Montezuma Pipekeepers by obtaining orders finding him in violation of the Business Ordinance, imposing fines, authorizing Petitioner's removal from the Montezuma property, which is also his residence, and granting the Nation full ownership of the Montezuma property and its contents, including commercial and personal property, (Dkt. No. 1, ¶¶ 104, 112, 116, 127, 134). These allegations, like those in *Shenandoah III*, concern economic restraints, not "actual liberty interests" and are therefore insufficient to invoke this Court's habeas jurisdiction under the ICRA. *See Shenandoah II*, 275 F. Supp. 2d at 286 ("Insofar as allegations by various plaintiffs concerning retaliatory conduct by defendants such as withholding of housing and/or heating assistance, withholding of government distribution checks and confiscation of boats and automobiles, and even the destruction or threatened destruction of their homes, it is clear that these alleged incidents concern economic restraints and/or personal property rather than actual liberty interests."). Accordingly, Respondents' motion to dismiss the due process, unlawful takings, and unlawful search and seizure claims (second, third, fourth, and fifth causes of action) is granted and these claims are dismissed for lack of subject matter jurisdiction.

2.    **Total Banishment Claims**
**(First and Sixth Causes of Action)**

Respondents move to dismiss Petitioner's banishment-related claims on the grounds that: unlike the banishment in *Poodry*, (1) Petitioner's banishment is not "permanent" and thus "is not cognizable in an ICRA writ of habeas corpus" and must be dismissed for lack of subject matter jurisdiction; (2) Petitioner has failed to exhaust tribal remedies; and, (3) Petitioner fails to state a claim of denial of due process or that the Banishment Ordinance is a bill of attainder or ex post facto law. (Dkt. No. 39-3, at 26–31). Petitioner opposes Respondents' motion. (Dkt. No. 41, at 15–19). For the reasons that follow, Respondents' motion to dismiss is denied with respect to the banishment-related due process and ex post facto law claims, but granted with respect to the bill of attainder claim.

a.    **Habeas Jurisdiction under ICRA**

Relying on language in the Banishment Ordinance allowing a banished individual, "[a]fter a period of one year," to request that the Cayuga Nation Council "lift the banishment," (Dkt. No. 1-5, at 6), Respondents attempt to distinguish the banishment here from that in *Poodry* by arguing that Petitioner's banishment "is not permanent." (Dkt. No. 39-3, at 26). However, the Notice of Total Banishment's prohibition on re-entry "at any future time," (Dkt. No. 1-7, at 3), is sufficient (at this stage) to show that the banishment was intended as permanent. Moreover, as alleged, the order of total banishment, appears to have the hallmarks the Second Circuit recognized in *Poodry* as showing a severe restraint on liberty. The Notice of Total Banishment includes Respondents' findings that Petitioner, failed "to respond to criminal charges in the Nation's court[,] . . . ignore[d] the warrant for his arrest," and "[e]ngag[ed] in behavior that

pose[d] a threat to the safety, welfare, and order of the Nation."[13] (Dkt. No. 1-7, at 3); *c.f.*
*Poodry*, 85 F.3d at 888 ("[R]espondents themselves view the petitioners' conduct as
'criminal.'"). The Notice of Total Banishment states that Petitioner "must immediately vacate the
Nation's reservation" and that Petitioner "is entirely prohibited from entering onto the Nation
reservation at any future time and for any reason." (Dkt. No. 1-7, at 3). Further, the Banishment
Ordinance vests responsibility for enforcement on "Nation law enforcement," which is directed
to "arrest[] any person who violates the terms of a banishment," which is "a Class I
misdemeanor," and to hold "the person . . . in custody pending release on bond." (Dkt. No. 1-5,
at 5–6). Given the allegations that Respondents imposed total banishment in response to
Petitioner's alleged failure to respond to criminal charges in the Nation Court and evasion of the
arrest warrant as well as Petitioner's alleged ongoing violation of the Business Ordinance by
operating Pipekeepers, the Court concludes Petitioner has plausibly alleged that the total
banishment is a criminal punishment and a severe restraint on his liberty for purposes of
invoking this Court's habeas jurisdiction.

### b.    Exhaustion of Tribal Remedies

Respondents argue that although Petitioner "did challenge the banishment order in tribal
court," because he "presents several arguments in this Court that he did not present in his tribal-
court challenge," his banishment claims are not properly before the Court. (Dkt. No. 39-3, at 20).
Petitioner opposes Respondents' motion, arguing that he fully exhausted his tribal court
remedies. (Dkt. No. 41, at 8–10). The Court agrees.

---

[13] The Notice also found that Petitioner was operating Pipekeepers without a license under the Business Ordinance
and occupying a Nation house without paying rent and ignoring judgments for unpaid rent. (Dkt. No. 2-6, at 3).

On June 16, 2023, Petitioner filed a petition for a writ of habeas corpus in the Nation Court under Rule 31 of the Cayuga Nation Rules of Civil Procedure seeking, *inter alia*, relief from the Banishment Ordinance. (Dkt. No. 1-14, at 4). As relevant here, Petitioner alleged "a deprivation of liberty without due process of law by enacting the Cayuga Nation Banishment Ordinance," that the Council Respondents violated his due process rights in applying it against him, and that "the enactment of the Banishment Ordinance on October 17, 2022 constitute[d] a bill of attainder and *ex post facto* law." (*Id.* at 6). The Nation Court denied his petition on September 25, 2023. (*Id.* at 17). Petitioner appealed, (Dkt. No. 37-3), and on February 20, 2024, the Cayuga Nation's Tribal Appellate Court affirmed dismissal, (*see* Dkt. No. 37-4 (Memorandum and Order issued by Edward D. Carni, Chief Judge of the Cayuga Nation Court of Appeals)).

The Second Circuit has stated "the general principle" of exhaustion of tribal remedies as follows: "parties who challenge, under federal law, the jurisdiction of a tribal court to entertain a cause of action must first present their claim to the tribal court before seeking to defeat tribal jurisdiction in any collateral or parallel federal court proceeding." *Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 65 (2d Cir. 1997). The Circuit explained:

> Requiring that litigants present their jurisdictional arguments to tribal courts in the first instance promotes tribal autonomy and dignity and encourages administrative efficiency by permitting the tribal courts to develop a full record prior to potential federal court involvement. The exhaustion requirement also bolsters the legitimacy of tribal courts, encourages them to articulate fully the claims of jurisdiction, and enables later reviewing courts to take advantage of their expertise.

*Id.* (citing *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856–57 (1985)).

Petitioner's Nation Court petition sought relief on the grounds that the banishment violated due process and was a bill of attainder and ex post facto law. The Nation Court denied the petition and the Nation Appellate Court affirmed the denial. The parties do not seem to dispute that Petitioner has pursued these arguments to exhaustion in tribal court. (Dkt. No. 39-3, at 28 (Respondents acknowledging that "Petitioner did challenge the banishment order in tribal court")). Respondents assert, however, that the present Petition contains several arguments that were not in the Nation Court petition, namely, Petitioner's arguments that the Nation Court lacked subject matter and personal jurisdiction and that the Nation Court judge "could not be impartial because he is an at-will employee whose salary is controlled by the Nation's leaders" and "was not properly appointed to decide civil matters." (*Id.* at 28–29 (citing Dkt. No. 2-1, at 20)); *see also* Dkt. No. 1, ¶¶ 35–42 (alleging Nation Court "judges are not elected or appointed" but selected by Respondents, who control compensation, that the Nation Court judge "was not qualified" under the Nation's "Judiciary Law," and that the Nation Court "has never ruled against the interests" of Respondents in any matter)).[14] Petitioner does not dispute that he did not make these arguments in his Nation Court habeas corpus petition. Instead, Petitioner argues that tribal exhaustion principles require only that he exhaust "jurisdictional arguments" and that his filing of the Nation Court petition satisfied this requirement. (Dkt. No. 41, at 10).

In *Basil Cook Enters.*, tribal officials seized the plaintiffs' gambling establishment, the Bingo Palace, which operated on the St. Regis Mohawk reservation, ousted the plaintiffs and

---

[14] These allegations appear to concern Petitioner's property seizure claims and the Nation Court's issuance of the Writ of Execution—not Petitioner's banishment claims. (*See* Dkt. No. 1, ¶ 119 (third cause of action alleging Writ of Execution issued by Nation Court and deprivation of Montezuma property violated Petitioner's right to due process and asserting that "[t]he manner in which [Respondent Fahey] is employed and compensated is in itself a violation of the principles of due process")). Indeed, the Cayuga Nation Council, not the Nation Court, issued the order of total banishment. But as Petitioner argues exhaustion only generally as to all claims, (*see, e.g.*, Dkt. No. 41, at 8–10), the Court, in an abundance of caution, considers these allegations with respect to his banishment claims.

took control of the establishment and all its contents. 117 F.3d at 64. The tribal officials sued the plaintiffs in tribal court seeking, *inter alia*, "to quiet title to the Bingo Palace and its adjoining land." *Id.* The plaintiffs filed an action in state court, which the defendants removed to federal court, alleging violations of, *inter alia*, the ICRA, §§ 1301–03 and various state tort laws, seeking to enjoin tribal court proceedings and "compel arbitration in connection with a management agreement governing the operation" of the Bingo Palace. *Id.* at 63–64. The gravamen of the plaintiffs' challenge was "that the Tribal Court lacked all authority to hear this dispute because the appointment of the presiding tribal judge was executed in violation of the tribal constitution." *Id.* at 67. The Second Circuit declined "to enter this interpretive thicket" resolving the tribal "constitutional matter" regarding judicial appointment and affirmed the district court's dismissal without prejudice to refiling upon the exhaustion of tribal remedies. *Id.* at 68.

Even by Petitioner's own interpretation of the tribal exhaustion principle, exhaustion of his arguments regarding the Nation Court's jurisdiction, namely, that it lacked both subject matter jurisdiction and personal jurisdiction, is required. Further, Petitioner's arguments concerning the propriety of the Nation Court judge's qualifications and appointment by, and allegedly consequent partiality to, Respondents concern the appointment, qualifications, and impartiality of tribal court judges. (*See* Dkt. No. 1, ¶ 40 (alleging Judge Fahey was not qualified to sit as a judge on the Nation's Tribal Court pursuant to the Halftown Faction Respondents' own Judiciary Law")). The Court therefore has little difficulty concluding that such arguments, like the plaintiffs' arguments concerning the tribal court judges in *Basil Cook Enters.*, are jurisdictional and subject to the exhaustion requirement. 117 F.3d at 68.

But this does not end the inquiry as there are "three narrow circumstances in which litigants may proceed directly to federal court":

> "[1] where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or [2] where the action is patently violative of express jurisdictional prohibitions, or [3] where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction."

*Basil Cook Enters*, 117 F.3d at 65 (quoting *National Farmers*, 471 U.S. 856 n.21). Here, Petitioner argues the first and third exceptions apply—that Respondents' assertion of tribal jurisdiction is motivated by a desire to harass in bad faith and that exhaustion would be futile as Respondents continue to obtain orders against him and then require exhaustion of each new order, effectively precluding him from ever exhausting tribal remedies. (Dkt. No. 41, at 8–10). These arguments, however, concern subsequent orders that are irrelevant to the banishment claim and say nothing about whether Petitioner could exhaust his remedies with respect to the Nation Court's jurisdiction (subject matter or personal) or his challenges to the appointment and impartiality of the Nation Court judge. Moreover, in view of the relationship of these arguments to Nation law and its tribal courts, the Court declines to address them in the first instance. *See Basil Cook Enters.*, 117 F.3d at 68 ("These constitutional questions are, for good reason, matters of tribal law reserved to the tribal judiciary to resolve.").[15] Thus, to the extent Petitioner's

---

[15] There is at least one district court decision in the Second Circuit on exhaustion in the context of a § 1303 petition for a writ of habeas corpus. In *Colebut v. Mashantucket Pequot Tribal Nation Tribal Elders Council*, No. 05-cv-247, 2006 WL 1646155, at *1 (D. Conn. June 9, 2006), the court noted that in *Poodry* the Second Circuit had analogized § 1303 "to the grant of habeas jurisdiction in other contexts," and that before filing a petition for a writ of habeas corpus challenging immigration proceedings under 28 U.S.C. § 2241 or state court convictions under 28 U.S.C. § 2254, "the party seeking review must obtain a final decision from that state agency." (citing *Poodry*, 85 F.3d at 890). In *Colebut*, however, the court did not discuss whether the party seeking review must raise each individual claim or argument prior to filing. In other Circuits, courts have required exhaustion of each individual claim or argument, dismissing those arguments that were not fully exhausted. *See, e.g.*, *Selam v. Warm Springs Tribal Corr. Facility*, 134 F.3d 948, 953 (9th Cir. 1998) (dismissing unexhausted claims).

banishment claims are premised on the Nation Court's subject matter or personal jurisdiction or challenges to the Nation Court judge's appointment or impartiality, they are dismissed for failure to exhaust tribal remedies. To the extent Petitioner's banishment claims are premised on alleged violations of due process and the contention that the Banishment Ordinance is a bill of attainder or ex post facto law, they may proceed.

### c.    Merits

Respondents move to dismiss the due process, bill of attainder, and ex post facto law banishment claims on the basis that Petitioner has failed to allege a violation of the ICRA. (Dkt. No. 39-3, at 29–31). Petitioner opposes dismissal of these claims. (Dkt. No. 41, at 19–21).

### i.    Due Process

Petitioner alleges that the banishment hearing violated his right to due process because "the Halftown Faction Respondents," whose "enmity toward Parker" was "well-documented," "enacted the Banishment Ordinance, determined the grounds upon which banishment was appropriate, established the legal process for banishment proceeding, and adjudicated the banishment proceedings." (Dkt. No. 1, ¶ 97; *see also id.* (arguing that Respondents "in essence, acted as a legislature, executive, and judiciary in the banishment proceeding"). In addition, Petitioner alleges that he "was not permitted to engage in discovery or to cross-examine" witnesses and "was not permitted to know the standard upon which" Respondents determined banishment. (*Id.* ¶ 96).

Section 1302 of the ICRA provides in relevant part that "No Indian tribe in exercising powers of self-government shall—deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law." 25 U.S.C. § 1302(a)(8). Under the ICRA, "defendants are entitled to many of the due process protections

accorded to defendants in federal or state criminal proceedings" but "the guarantees are not identical." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 194 (1978).

In moving for dismissal of Petitioner's due process claim on the merits for failure to state a claim, Respondents do not meaningfully brief the due process required under the circumstances of this case. Quoting *Alvarez v. Lopez*, 835 F.3d 1024, 1028–29 (9th Cir. 2016), Respondents assert that "courts weigh the individual right to fair treatment against the magnitude of the tribal interest to determine whether the procedures pass muster under ICRA." (Dkt. No. 39-3, at 29 (ellipses omitted in original)). Respondents also cite case law from outside the Second Circuit in support of the proposition that in exercising their sovereign immunity, "Indian nations today commonly empower their tribal leaders to exercise a tribe's power of expulsion." (*Id.* at 30 (citing *Chegup v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 28 F.4th 1051, 1056–58 (10th Cir. 2022); *Tavares v. Whitehouse*, 851 F.3d 863, 867–68 (9th Cir. 2017)). But other than a broad assertion that "Petitioner and his counsel were extended every consideration and courtesy sought by them in preparation and scheduling of the Banishment Hearing," (Dkt. No. 39-3, at 30 (quoting Dkt. No. 1-14, at 14–15)), Respondents do not address the Petition's allegations regarding discovery or cross-examination of witnesses, or whether the ICRA's due process provision requires these procedures. Without additional, thorough briefing, on the legal requirements of due process under the ICRA, the Court concludes that Respondents have failed to show that the Petition fails to state a banishment-related due process claim as a matter of law. Accordingly, Respondents' motion to dismiss the banishment-related due process claim (first cause of action) is denied.

### ii.    Bill of Attainder or Ex Post Facto Law

Respondents move for dismissal of Petitioner's claim that the Banishment Ordinance constitutes a bill of attainder or ex post facto law, in violation of § 1302(a)(9). (Dkt. No. 39-3, at 31). Petitioner opposes Respondents' motion. (Dkt. No. 41, at 21). Section 1302 of the ICRA provides in relevant part that "No Indian tribe in exercising powers of self-government shall— (9) pass any bill of attainder or ex post facto law." 25 U.S.C. § 1302(a)(9).

Petitioner argues that the Banishment Ordinance is "clearly an ex post facto law and bill of attainder in that it was expressly passed to specifically punish Parker for the operation of Pipekeepers." (Dkt. No. 41, at 21). Petitioner asserts that the order of total banishment lists his "prior operation of Pipekeepers as a reason for banishment," and that the timing of the enactment of the Banishment Ordinance, which includes "violation of the business ordinance as grounds for banishment shows a clear intent to target Parker." (*Id.*).

In *Shenandoah III*, the Second Circuit rejected a similar argument regarding the enactment of a housing ordinance as a bill of attainder. 366 F.3d at 92. The Circuit explained that "[a] bill of attainder is 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without . . . the protections of a judicial trial." *Id.* (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)). Here, like the plaintiffs in *Shenandoah III*, Petitioner argues that Respondents enacted the Banishment Ordinance designed to remove him from the reservation as punishment for his operation of Pipekeepers. (Dkt. No. 41, at 21). But the Banishment Ordinance applies to "Any person, whether the person is a Nation citizen or not," (Dkt. No. 1-5, at 4), and thus "cannot be said to single out any individuals," *Shenandoah III*, 366 F.3d at 92 (dismissing bill of attainder claim where the ordinance applied "to all residents of the territory at issue").

"To violate the *Ex Post Facto* Clause . . . a law must be retrospective—that is, it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it, by altering the definition of criminal conduct or increasing the punishment for the crime." *United States v. Weinlein*, 109 F.4th 91, 98 (2d Cir. 2024) (quoting *Abed v. Armstrong*, 209 F.3d 63, 66 (2d Cir. 2000)). Here, however, neither party has addressed Petitioner's claim that the Banishment Ordinance is an ex post facto law and the Court declines to be the first to conduct the analysis. Accordingly, Respondent's motion to dismiss is granted as to the bill of attainder claim but denied as to the ex post facto law claim.

### 3.    Respondent Timothy Twoguns

Respondents assert that "Petitioner's banishment challenges should be dismissed against Respondent Twoguns," as he was no longer a member of the Cayuga Nation Council at the time of Petitioner's banishment and had no part in the banishment determination. (Dkt. No. 39-3, at 31 (citing Notice of Total Banishment, Dkt. No. 2-6, at 21 (including list of signatories but not including Respondent Twoguns)). Petitioner does not respond to this argument. As the Petition alleges that Respondent Twoguns is "the currently recognized Alternate Federal Representative of the Nation and a member of the Cayuga Nation Council," (Dkt. No. 1, ¶ 10), the Court declines to dismiss Respondent Twoguns at this juncture. However, the Court directs the parties to confer to determine whether dismissal of this respondent would be appropriate.

## IV.    MOTION FOR PRELIMINARY INJUNCTION

### A.    Standard of Review

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. In general, a party seeking a preliminary injunction must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for

litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the presence of sufficiently serious questions, that the balance of hardships tips decidedly in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

### B.    DISCUSSION

Petitioner seeks an order preliminarily enjoining Respondents from enforcing the July 5, 2024 Writ of Execution, and restraining Respondents from: (1) entering the Montezuma Pipekeepers; (2) removing Petitioner "and/or any other persons present at the Property, from the Property"; (3) taking, or in any way interfering with "any and all business and personal property, monies, goods, products, materials, or fixtures located at or with in the Property; (4) otherwise interfering with Parker's right to own, possess, and occupy the Property or any and all business and personal property . . . located therein," (Dkt. No. 2, at 2–3); and (5) prohibiting Respondents from enforcing the April 25, 2023 Nation Court judgment through civil confinement, (Dkt. No. 12, at 3). Respondents oppose Petitioner's motion. (Dkt. No. 33-1, at 16–17).

As a preliminary matter, in light of the Court's decision granting Respondents' motion to dismiss all property-seizure claims for lack of subject matter jurisdiction and the banishment-related bill of attainder claim for failure to state a claim, Petitioner cannot establish a likelihood of success or serious question as to these claims and his motion for a preliminary injunction as to the second, third, fourth, and fifth causes of action and as to the bill of attainder aspect of the sixth cause of action is denied.[16]

---

[16] Petitioner's supplemental request for relief, (Dkt. No. 12), concerns events outside the Petition and there has been no application to file a supplemental Petition. In any event, Petitioner has not shown an exhaustion of tribal remedies as to these events. Thus, he fails to show a likelihood of success or serious question going to the merits.

### 1.    Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp.*, 559 F.3d at 118 (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS 5396, at *4 (N.D.N.Y. Jan. 11, 2019), and "[i]n the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied," *Rodriguez*, 175 F.3d at 234. "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

Petitioner's assertion of irreparable harm focuses on the threat Respondents' implementation of the Writ of Execution poses to his residence and business. (Dkt. No. 2-1, at 14–16; Dkt. No. 37 at 16–17; *see also* Dkt. No. 2-1, at 14–16 (asserting that, if not enjoined, Respondents' "physical[] (likely using violence to do so) seiz[ure of] the Montezuma property, evict[ion of] [Petitioner] and his family, and tak[ing of] his personal property," would render his family homeless and destroy his business). But as the Court has dismissed the claims relating to the Writ of Execution and Petitioner does not allege any connection between this alleged harm and his surviving claims relating to banishment, the Court finds this alleged harm does not support a claim for injunctive relief here.

Furthermore, notably absent from Petitioner's briefing is any argument of irreparable

harm with respect to the notice of total banishment, which Respondents issued on July 13, 2023,

(Dkt. No. 1-7, at 2), more than a year before Petitioner filed the present action, (Dkt. No. 1 (filed

July 17, 2024)), and which was affirmed by the Nation Court of Appeals on February 20, 2024,

(Dkt. No. 37-4, at 4), five months before the present motion for injunctive relief.[17]

Accordingly, the Court concludes that Petitioner has not established irreparable harm

with respect to his surviving banishment claims.

### 2.    Likelihood of Success or Serious Question

Generally, preliminary injunctions are prohibitory or mandatory. *N. Am. Soccer League*,

883 F.3d at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case;

mandatory injunctions alter it." *Id.* The "status quo . . . is[] 'the last actual, peaceable uncontested

status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d

116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a

heightened legal standard by showing 'a clear or substantial likelihood of success on the

merits.'" *Id.* (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d

---

[17] Petitioner's proposed order seeks a writ of habeas corpus in connection with "Parker's banishment from the Nation's land" for operating Pipekeepers, but, as relevant here, it contains no proposed language enjoining Respondents from enforcing the banishment order. (Dkt. No. 2, at 1–3). Specifically, the proposed order seeks:

> a preliminary injunction enjoining the Halftown Faction Respondents and their agents, servants, employees, and all persons acting in concert with them from effectuating or seeking to enforce of the Writ of Execution issued by the Respondent Fahey on July 5, 2024, including (i) entering the property located at 7153 State Route 90N, Montezuma, New York 13034 (the "Property"); (ii) removing Dustin Parker ("Parker"), and/or any other persons present at the Property, from the Property; (iii) taking, possessing, moving, removing, destroying, altering, or in any other way interfering with any and all business and personal property, monies, goods, products, materials, or fixtures located at or within the Property; and (iv) otherwise interfering with the right of Parker to own, possess, and occupy the Property or any and all business and personal property, monies, goods, products, materials, or fixtures located therein.

(*Id.* at 2–3). In any event, Petitioner has failed to articulate any theory of irreparable harm with respect to the order of banishment, accordingly, the Court concludes he has failed to establish this element.

Cir. 2012)). "A heightened 'substantial likelihood' standard may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

"To establish a likelihood of success on the merits, a plaintiff must show that he is more likely than not to prevail on his claims, or, in other words, that the 'probability of prevailing is better than fifty percent.'" *Doe v. Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *20 (S.D.N.Y. Nov. 21, 2019) (quoting *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000)). The Second Circuit has instructed that "'[i]n considering the less rigorous serious-questions standard for a preliminary injunction,'" courts should "recognize that the first component of this standard, in addition to a balance of hardships tipping decidedly in favor of the moving party, is 'sufficiently serious questions going to the merits *to make them a fair ground for litigation*.'" *Trump v. Deutsche Bank AG*, 943 F.3d 627, 673 (2d Cir. 2019) (emphasis in original) (quoting *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019)), *vacated and remanded on other grounds sub nom. Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020); *see Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) ("The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." (citing *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 815–19 (2d Cir. 1979))).

In this case, the parties appear to agree that Petitioner is seeking a prohibitory injunction, but Respondents assert that Petitioner must establish a likelihood of success—as opposed to a serious question going to the merits—because the "serious-question standard cannot be used to preliminarily enjoin governmental action." (Dkt. No. 33-1, at 16 (quoting *Trump v. Deutsche Bank AG*, 943 F.3d at 637)). Petitioner does not reply to this argument. The Court need not resolve this issue because Petitioner's motion fails under both standards.

Petitioner appears to assume that the available relief, should a writ of habeas corpus issue with respect to total banishment, would (in addition to "reversing the banishment" and declaring the banishment a deprivation of due process and a "an ex post facto law") include an order "permanently enjoining Respondents from attempting seizure of the Montezuma property." (Dkt. No. 1, at 32–33). However, in the few cases involving banishment-related petitions for habeas corpus under the Indian Civil Rights Act, the habeas relief sought has been limited in nature and related solely to banishment. For example, in *Sweet v. Hinzman*, 634 F. Supp. 2d 1196, 1201 (W.D. Wash. 2008), the petitioner, who had been banished, sought an order directing that the Tribal Council, "provide them with the rights they are afforded by the ICRA and the Bill of Rights of the Tribe's Constitution," *see also*, *e.g.*, *Colebut v. Mashantucket Pequot Tribal Nation Tribal Elders Council*, No. 05-cv-00247, 2007 WL 174384, at *3, 2007 U.S. Dist. LEXIS 8035, at *7 (D. Conn. Jan. 19, 2007) (noting that in his initial petition, "Petitioner moved, pursuant to Title I of the Indian Civil Rights Act of 1968 . . . for 'an Order of Reinstatement,' seeking reinstatement back into the Tribe and 'retro-active privileges and benefits from the date of banishment'"). And as claims for injunctive or declaratory relief are not otherwise independently actionable under the ICRA, and as Petitioner has not identified any legal authority allowing for relief beyond a determination regarding the legality of the order of total banishment, the Court

finds that Petitioner has failed to show a likelihood of success or serious question as to his entitlement to the injunctive relief sought. *See Wasson v. Pyramid Lake Paiute Tribe*, No. 10-cv-00123, 2010 WL 4293349, at *4, 2010 U.S. Dist. LEXIS 119965, at *10 (D. Nev. Oct. 20, 2010) (holding that "the only remedy available under the ICRA is habeas corpus" and that "[i]njunctive and declaratory relief, as Plaintiffs request, are not available"); *Barnes v. White*, 494 F. Supp. 194, 196 (N.D.N.Y. 1980) (explaining that "All doubt was erased in *Santa Clara*, with the Court finding that no private cause of action for [injunctive or declaratory] relief was available" under § 1302 of the ICRA); *Chegup*, 28 F.4th at 1063 (10th Cir. 2022) (observing that the Supreme Court rejected the proposition that the ICRA implicitly authorized causes of action for declaratory and injunctive relief and recognizing that "caution is especially called for when interpreting ICRA . . . because Congress sought 'to promote dual objectives in a single statute'— extending rights to individual Indians *and* furthering tribal self-determination" (quoting *Santa Clara Pueblo*, 436 U.S. at 64)).

Accordingly, because the ICRA does not allow for injunctive or declaratory relief, and Petitioner does not identify any other legal basis for his claims, Petitioner has failed to show a likelihood of success or serious question going to the merits, Petitioner's motion is denied. *See Wheeler v. Swimmer*, 835 F.2d 259, 261 (10th Cir. 1987) ("The district court correctly held that the Indian Civil Rights Act confers no subject matter jurisdiction in this case for declaratory, injunctive, and monetary damage remedies. The only federal relief available under the Indian Civil Rights Act against a tribe or its officers is a writ of habeas corpus."); *see also Timbisha Shoshone Tribe v. Kennedy*, 687 F. Supp. 2d 1171, 1187 (E.D. Cal. 2009) (denying motion for preliminary injunction, concluding that because the defendants raised "serious jurisdictional

issues in this action which may bar Plaintiffs' suit, Plaintiffs have failed to make a 'clear showing' that they are likely to succeed in this action").

### 3. Balance of Hardships and Public Interest

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)). Furthermore, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger*, 607 F.3d at 80.

Petitioner's failure to demonstrate a likelihood of success on the merits or sufficiently serious questions going to the merits is sufficient to deny injunctive relief. *See Salinger*, 607 F.3d at 75 n.5; *Faiveley*, 559 F.3d at 119. Accordingly, the Court need not consider the remaining balance of hardships and public interest factors. *Conn. State Police Union v. Rovella*, 36 F.4th 54, 68 (2d Cir. 2022) ("Because the District Court did not err in concluding that the [plaintiff] could not succeed on the merits of its claim, we need not address the remaining prongs of the preliminary injunction test, including whether the [plaintiff] demonstrated irreparable harm or whether an injunction would be in the public interest.").

### V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Respondents' motion to dismiss (Dkt. No. 39) is **GRANTED** as to the due process claims asserted in the second, third, and fourth causes of action, the takings claim in the fifth cause of action, and the bill of attainder claim in the sixth cause of action and these claims are dismissed without prejudice for lack of subject matter jurisdiction; and it is further

**ORDERED** that Respondents' motion to dismiss (Dkt. No. 39) is otherwise **DENIED**; and it is further

**ORDERED** that Petitioner's motion for a preliminary injunction (Dkt. No. 2) is **DENIED;** and it is further

**ORDERED** that the parties are directed to meet and confer and file a status report by November 15, 2024 informing the Court how they seek to proceed on the habeas petition and their position on whether the Court should apply the Rules Governing Section 2254 Cases in this proceeding. *See*, *e.g.*, Rule 1(b) of the Rules Governing Section 2254 Cases ("The district court may apply any or all of these rules to a habeas corpus petition not covered by Rule 1(a)."); *see also* Northern District of New York Local Rules of Procedure for Section 2254 Cases and Section 2255 Proceedings, Rule 1.1.

**IT IS SO ORDERED.**

Dated: <u>November 1, 2024</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge